OPINION OF THE COURT
Joseph Harris, J.
Defendant moves for an order pursuant to GPL 710.20 to suppress statements made by the defendant to law enforcement officers. The motion is denied upon three primary grounds: (1) The interrogation was noncustodial; (2) People v Skinner (52 NY2d 24) is not applicable to the fact situation of the instant case in that the investigation in whic^i the interrogation in the instant case took place was a “missing person” investigation, not a “criminal” investigation; (3) At the time of the interrogation and the statements involved herein, neither had the right to counsel attached, nor had counsel entered the case, nor had the defendant requested counsel or invoked the right to counsel.
In order to fully understand the instant case and to place it in its proper context, it is necessary to summarize briefly *829 the history in the judicial system of New York State of a criminal defendant’s privilege against self incrimination and right to counsel.
Miranda v Arizona (384 US 436) is the mother lode. In that case the United States Supreme Court declared that “custodial interrogation” was “inherently coercive” and in order to protect and enhance the privilege against self incrimination in such an environment, the police would be required, before any questioning in a custodial setting, to advise the person being questioned “that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.” (Miranda v Arizona, supra, p 404.) These words, and semantic variations thereof, have come to be known as the Miranda warnings. A defendant could waive effectuation of these rights, provided that the waiver was made “voluntarily, knowingly and intelligently.” (Miranda v Arizona, supra, p 404.) The purpose of these warnings was to advise an unknowledgeable defendant of his constitutional privilege against self incrimination and his right to counsel, so that in the “inherently coercive” environment of in-custodial police interrogation said defendant would be mindful of his rights and any waiver thereof would be his own free choice. This of course would limit the ability of the police to investigate and solve crimes, but the Supreme Court felt the policy considerations inherent in this new procedure were worth the price of the limited intrusion into the essential criminal investigatory functions of the police.
The original Miranda decision required only that the defendant clearly be advised of his rights by the police and that he waive these rights, in effect, of his own free will and volition, before any questioning was permissible and any resulting statements admissible in evidence. There was no requirement that he must be advised by counsel, if counsel was not requested, before his Miranda rights could be waived. However, over the years, the New York Court of Appeals, interpreting the New York constitutional equivalent of the privilege against self incrimination and the right to counsel of the Federal Constitution (NY Const, art I, §6), engrafted on to the procedural requirements set *830 forth by the United States Supreme Court in Miranda (supra) a series of additional and more restrictive requirements. There developed in this State, on a case-by-case basis, the rule that under certain circumstances the right to counsel “includes the right of an accused to have an attorney present while he is considering whether to waive his rights” (People v Cunningham, 49 NY2d 203, 208). In such cases, the right to counsel was said to have “indelibly attached” — that is, there could be no effective waiver of counsel unless made in the presence of counsel (People v Settles, 46 NY2d 154, 165-166). This rule of nonwaivability of counsel except in the presence of counsel was recognized in two lines of decisions: One where the person being questioned was in fact represented by counsel not present (e.g., People v Arthur, 22 NY2d 325; People v Hobson, 39 NY2d 479; People v Rogers, 48 NY2d 167) — these are the “entry of counsel” cases; the other where formal criminal proceedings have been commenced (e.g., People v Samuels, 49 NY2d 218; People v Settles, supra) — these are the attachment of counsel cases.
All of these cases had either of two things in common: Either the person being questioned and attempting to waive his right to counsel was in custody at the time of questioning, or the person being questioned and attempting to waive his right to counsel had prior to said questioning been formally accused in some manner of the commission of a crime. And indeed, except in the special case of the formal commencement of a criminal action, until People v Skinner (52 NY2d 24) it was widely thought and held in the New York courts that nonwaivability of counsel, once counsel had entered the case, applied only to situations of “custodial” interrogation, not to “noncustodial” interrogation, just as the fountainhead rules of the original Miranda decision were applicable only to “custodial” interrogation situations and not to “noncustodial” interrogation, the sine qua non for which was, as aforesaid, to balance the coerciveness judicially perceived to be inherent in custodial interrogation. At all times the need for meaningful law enforcement and criminal investigation was recognized by the New York courts, and confining the nonwaivability of counsel rule to custodial interrogation in entry of counsel *831 cases, and to all cases only where there was a formal commencement of a criminal action — i.e., where the investigatory stage of the police criminal function had entered the formal accusatory stage by the filing of an accusatory instrument — was felt to be an acceptable compromise between the vital stake of society in law enforcement and the desire to assure that waiver of counsel was freely made and not coerced.
In Skinner (supra) for the first time a majority of the New York Court of Appeals applied the nonwaivability of counsel rule to an entry of counsel case where the criminal suspect was neither in custody nor formally charged with a crime. The suspect had been properly advised of his Miranda rights and had freely and voluntarily waived these rights, including the right to the presence of counsel. The purported legal basis for the application of the rule to Skinner was that the suspect’s right to counsel had somehow “indelibly” attached merely because the defendant had previously retained an attorney to counsel him during the ongoing investigation, and could not be waived at any time, even in a noncustodial, noncoercive setting, even if the suspect wanted to.
Skinner (supra) is not applicable to nor dispositive of the instant case for two reasons: (1) The court holds that under the evidence in the instant case, neither had the right to counsel .attached, nor had counsel entered the case, nor had the defendant requested counsel or invoked the right to counsel; and (2) the principles of right to counsel involved in Skinner are principles applicable only to the criminal law, and Skinner and these principles are applicable only in the context of a criminal investigation, not the type of investigation involved in the instant case.
There are many police functions that are “noncriminal” in nature, even though ultimately it is discovered in the exercise of that function that a crime has been committed. In the instant case it was reported to the police by his mother that one Vincent (Jim) Scuderi, a young man in his early twenties, was missing. There were no clues to his whereabouts. There was no reason to suspect homicide, nor even that Vincent Scuderi was dead. Indeed, in addition to notifying the police and requesting their assistance to *832 locate their son, the Scuderi’s hired a private investigator to aid in this task.
The police commenced a “missing person” investigation. In the course of this investigation they interviewed a number of persons known to be friends of the missing young man, including the defendant who was his closest friend. The defendant was interviewed on two occasions, May 29 and 30, 1981, by Detective Harrington of the Albany Police Department, neither of which times were custodial and at each of which he was at all times free to go, and indeed at the conclusion of each of these interviews the defendant did in fact leave the police presence. At no time did the defendant indicate that he did not desire to speak to the police nor that he desired counsel nor that he was represented by counsel. At all times he appeared to be willingly and gladly co-operating with the investigation.
Early in June, 1981, Detective Harrington desired to speak to the defendant again. He called the defendant’s home and spoke to the defendant’s father, Robert Weinman, the defendant not being at home at the time. He told the defendant’s father that this was strictly a missing person investigation into the whereabouts of Vincent Scuderi, a friend of his son, and he was interested in having his son come down to the detective office with his father and take a polygraph. Detective Harrington testified that the defendant’s father was co-operative and that this was agreeable to him after his son returned from work.
A short time later that day, Detective Harrington received a telephone call from one Howard Roth who identified himself as the defendant’s father’s real estate attorney. He wanted to know what the matter was about and Harrington explained to him that this was a missing person investigation and not a criminal investigation, that his client’s son was not a suspect in anything except for the fact he thought his client’s son might be holding back information as to the whereabouts of his friend Vincent Scuderi, and that he, Harrington, would like his client’s son, together with his father, to come down to the detective office to make arrangements for a polygraph. According to Detective Harrington, Mr. Roth stated that he was not a *833 criminal lawyer and would contact a Mr. Cheeseman, who was, and would get back to Harrington.[1]
Harrington testified that at no time did Roth indicate that he represented the defendant and that Roth never told him to stop talking to or cease from contact with the defendant. Harrington testified that at the time of the conversation with Roth he had no reason to believe the Scuderi boy to be dead, and that the two uppermost explanations for Scuderi’s disappearance in his mind was suicide[2] and “hiding out for some reason because there was a wárrant issued for his arrest in Rensselaer.”[3]
The testimony of Howard Roth is at best equivocal. He admitted that the only member of the defendant’s immediate family he ever represented was the defendant’s father, Robert Weinman, whose real estate attorney he was, and that he never in the past represented the defendant William Weinman or any of his seven brothers and sisters. He admitted that his telephone call to Detective Harrington was not at the request of the defendant, that his involvement in the matter was not at the request of the defendant, and indeed, to the very date of his, Roth’s, testimony, he had never even spoken to the defendant about the subject matter of this case. Mr. Roth admitted he has never been paid by anyone with respect to any aspect of this case and its prologue, nor does he expect to be paid. Under the totality of all of the circumstances herein, and in the light of all of the evidence educed at the hearing, the court credits all of the testimony of Detective Harrington and discredits the testimony of Howard Roth to the extent that it conflicts with the testimony of Detective Harrington.[4]
*834 Approximately one week after the above conversation with attorney Roth, on June 9, 1981, thinking that attorney Cheeseman might have been retained to represent the defendant, Detective Harrington and his superior, Detective-Sergeant Jones spoke to attorney Cheeseman to see if he could possibly assist them in locating the missing Vincent Scuderi. Attorney Cheeseman informed the officers that he had not been contacted by attorney Roth nor anyone on behalf of the defendant, that he did not represent the defendant, and that he knew nothing whatsoever about the matter except that he did know the Weinman family.
Thereafter, an unidentified dead and badly decompbsed body found in the woods of Essex County was identified by the New York State Police as that of the missing Vincent Scuderi. On June 13,1981, Investigator Bradley[5] and Lieutenant Leu of the New York State Police approached the defendant in the parking lot adjacent to Neba’s on Central and Colvin Avenues in the City of Albany and asked him if he would accompany them to the Loudonville State Police Headquarters to talk to Investigator Bradley about an investigation he was conducting. The defendant voluntarily agreed to do so. The defendant was not in custody and was free to go. At State Police headquarters, Investigator Bradley advised the defendant of his Miranda rights. The court finds that these were given clearly and completely and were fully understood by the defendant. At no time did the defendant request counsel and at no time did he state to anyone that he was represented by counsel. He was asked if he would be willing to discuss the investigation Bradley was conducting and answer his questions, and the defendant responded in the affirmative. The court finds that the defendant waived his Miranda rights and that said waiver was made by him knowingly, intelligently and voluntarily. Thereafter Investigator Bradley advised the defendant that they had found the body of Vincent Scuderi. A full confession ensued.
The court finds that at no time prior to this confession did a right to counsel attach on behalf of the defendant, *835 that at no time prior to this confession had counsel entered the case so as to make the waiver by defendant of his right to counsel ineffective, and that at no time prior to this confession had the defendant requested counsel or invoked the right to counsel.
The right to counsel is a personal right and must be invoked by the individual asserting the right, unless perhaps he is an unemancipated minor of tender years, which the defendant in this .case is not. Even in Skinner (52 NY2d 24, supra) the Court of Appeals recognized that the right to counsel is a personal right, for the rationale there was that “In retaining an attorney specifically in response to repeated police-initiated contacts, defendant unequivocally indicated that he felt himself unable to deal with the authorities without legal assistance.” (People v Skinner, supra, pp 31-32.)
The defendant was 20 years of age, at least of average intelligence, and with his own employment separate and apart from his family. He was in. every sense emancipated and capable of making his own decisions. Whatever else can be said about the involvement of attorney Howard Roth in this matter, it was not at the instance and request of the defendant. At no time, unlike Skinner (supra, p 32), did the defendant unequivocally, or in any way, “indicate *** that he felt himself unable to deal with the authorities without legal assistance.”
The defendant’s oral confession was reduced to writing arid signed by him at approximately 1:55 p.m. At about 3:40 p.m. attorney Cheeseman called Lieutenant Murray, Chief of Detectives of the Albany Police Department, and informed him that he now represented defendant William Weinman, that he understood his client was now in police custody and he instructed Lieutenant Murray that all further questioning of defendant cease. Cheeseman reaffirmed to Murray that he had previously told his detectives that he did not represent defendant Weinman.
At this time, which was subsequent to the confession, the defendant was in the custody of the Albany police and was showing them the scene of the homicide 1 Lieutenant Murray contacted his officers by radio, told them that the *836 defendant was now represented by counsel, and instructed them that all further questioning cease. All further questioning thereupon did cease!
For the above reasons the motion to suppress statements made by the defendant to law enforcement officers prior to attorney Cheeseman’s informing the police, at approximately 3:40 p.m. on June 13,1981, that he now represented the defendant and wished all questioning to cease, is denied.
Even though the court has found that there was in fact no entry of counsel in this case, and even though the above ruling is dispositive of the issues of this motion, the court feels a further comment is warranted, distinguishing the instant case from the Skinner case. The Skinner case involved a criminal investigation of a known criminal event; the instant case, until at least June 13, 1981, involved a noncriminal missing person investigation of an event not known to be criminal. The right to counsel under the United States Constitution and the Constitution of the State of New York is a right applicable solely in the context of a criminal case. It is inconceivable to this court that the police can be judicially prevented from questioning and obtaining information with respect to the whereabouts of a missing person from a willing subject in a noncustodial setting just because he had previously retained counsel in a matter not then known to be a criminal event. This would be unnecessary to the safeguarding of the constitutional right to counsel, would be cruel and inhuman, and destructive of vital interests of society without any meaningful enhancement of compensating considerations. To apply Skinner (supra) to the instant case, even if there had been entry of counsel, would be the next step to banning police questioning in all cases. Thus would the balanced compromise between the competing values of the right to counsel and the vital interest of society in law enforcement, begun in Miranda v Arizona (384 US 436, supra) in an attempt to overcome the perceived inherent coerciveness of custodial interrogation, have run full circle into anarchy.
In addition to his motion to suppress statements, the defendant moved for an order suppressing the use in evi *837 dence of certain tangible property seized pursuant to a search warrant issued after the defendant made his confession. The court has examined the search warrant and the application upon which it was based, and finds that said search warrant and application therefor are in all respects regular and in compliance with the law, and that there was probable cause for the issuance of said search warrant. The motion to suppress the tangible property seized pursuant to said search warrant is denied.
The foregoing constitutes the findings of fact and conclusions of law of this court. Said findings of fact and conclusions of law are made beyond a reasonable doubt.

. Paul Cheeseman is the now-retained counsel for the defendant.

. Vincent Scuderi’s father had previously committed suicide.

. The deceased had never been involved in any criminal activity. This was a minor warrant secured by one of his tenants in a house he had purchased in Rensselaer. Harrington thought the defendant might be hiding Vincent Scuderi out. All the police knew at this time was that the Scuderi boy was missing for several days from his home and his job, something he had never done before, and his family was very concerned.

. It is instructive to note in this connection that the testimony of all prosecution witnesses, that at no time did the defendant, a young man 20 years of age and of intelligence, even request an attorney, or indicate that he was represented by an attorney, is uncontroverted in the record of the hearing. Neither the name of Howard Roth nor Paul Cheeseman was ever mentioned to any police officer by the defendant. The defendant cannot be heard to argue that he did not testify at the hearing because his testimony might be prejudicial to his case at trial; at a suppression hearing at testifying defendant cannot be examined as to his guilt or innocence.

. Investigator Bradley was stationed in Lake Placid. He conducted the interview because the body was found in Essex County.